UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CHARLES B. SHANE, M.D.; JEFFREY BOOK, D.O.;
LANCE R. GOODMAN, M.D.; H. ROBERT HARRISON, M.D.;
GLENN L. KELLY, M.D.; LEONARD J. KLAY, M.D.;          Case No.
MARTIN MORAN, M.D.; MANUEL PORTH, M.D.;              04-21589-CIV-MORENO
THOMAS BACKER, M.D.; SUSAN HANSEN, M.D.;
ANDRES TALEISNIK, M.D.; JULIO TALEISNIK, M.D.;
ROGER WILSON, M.D.; CALIFORNIA MEDICAL ASSOCIATION;
TEXAS MEDICAL ASSOCIATION; MEDICAL ASSOCIATION
OF GEORGIA; FLORIDA MEDICAL ASSOCIATION and
LOUISIANA STATE MEDICAL SOCIETY,

       **Plaintiffs,**

v.

HUMANA, INC.; COVENTRY HEALTH CARE, INC.;
HEALTH NET, INC.; HUMANA HEALTH PLAN, INC.;
PACIFICARE HEALTH SYSTEMS, INC.; PRUDENTIAL
INSURANCE COMPANY OF AMERICA; UNITED
HEALTH GROUP; UNITED HEALTH CARE;
WELLPOINT HEALTH NETWORKS, INC.;
and ANTHEM, INC.,

       **Defendants.**

NIGHT
FILED

SEP - 2004

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

# AMENDED CLASS ACTION COMPLAINT

Plaintiffs Charles B. Shane, M.D., Jeffrey Book, D.O., Lance R. Goodman, M.D., H.

Robert Harrison, M.D., Glenn L. Kelly, M.D., Leonard J. Klay, M.D., Martin Moran, M.D.,

Manuel Porth, M.D., Thomas Backer, M.D., Andres Taleisnik, M.D., Julio Taleisnik, M.D.,

Roger Wilson, M.D., California Medical Association, Texas Medical Association, Medical

Association of Georgia, Florida Medical Association, Louisiana State Medical Society, and

Denton County Medical Society sue Defendants Humana, Inc., Humana Health Plan, Inc.,

Coventry Health Care, Inc., Health Net, Inc., PacifiCare Health Systems, Inc., Prudential

Insurance Company of America, United Health Group, United Health Care, WellPoint Health

Networks, Inc. and Anthem, Inc., and allege as follows:



## PRELIMINARY STATEMENT

This class action complaint is being filed pursuant to the suggestion of Judicial Panel On Multidistrict Litigation in *In re Managed Care Litig.*, Case No. 1334, and by leave of this Court in *In re: Managed Care Litigation*, Master File No. 00-1334-MD-MORENO.   With the exception of allegations relating to plaintiffs who are no longer parties, claims that have been dropped, and defendants that have settled, the allegations set forth below are identical to those in the Provider Plaintiffs' Second Amended Consolidated Class Action Complaint, which is currently pending before Judge Frederico Moreno in *In re: Managed Care Litig.*, Master File No. 1334-MD-MORENO.   Allegations pertaining to claims that have been dismissed in that case are included to preclude any implication of waiver rather than to reassert them.

## NATURE OF THE CASE

1.   The Individual Plaintiffs (hereinafter referred to as Plaintiffs) bring this action on behalf of themselves and a class of similarly situated physicians seeking redress for the illegal acts of the Defendants which have resulted in a loss of their property and a detriment to their businesses, and for declaratory and injunctive relief to end those practices and prevent further losses.

2.   The Associational Plaintiffs also seek injunctive relief on behalf of their members who will continue to suffer as a result of Defendants' illegal conduct unless it is stopped.

3.   Additionally, although this action is based upon the relationships which exist between doctors and insurers rather than the relationship between the insured and insurer, Plaintiffs are also motivated by their belief that Defendants' scheme is detrimental to the health of their patients and to the welfare of the general public.   By taking funds that have been rightfully earned by physicians and diverting them to their own use, Defendants deprive physicians of the adequate and timely payments they need to maintain their practices.

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

4.  As set forth below, the fundamental premise of the relationship between Defendants and the doctors who treat their insureds, either pursuant to or without a contract, is that the doctors will be paid, in a timely manner, for the covered, medically necessary services they render.

5.  However, Defendants, on their own and as part of a common scheme, systemically deny, delay and diminish the payments due to doctors so that they are not paid in a timely manner for the covered, medically necessary services they render.

6.  This is done by covertly denying payments to physicians based on financially expedient cost and actuarial criteria rather than medical necessity, processing physicians' bills using automated programs which manipulate standard coding practices to artificially reduce the amount they are paid, and by systematically delaying payments to gain increased use of the physicians' funds.

7.  When physicians treat Defendants' insureds pursuant to capitation agreements, i.e. agreements to pay groups of physicians based on the number of patients they agree to treat rather than on the services they actually render, Defendants use the same scheme both to deny, delay and diminish payments due to the doctors and to reduce capitation payments.  In addition, Defendants covertly manipulate the capitation process so as to undermine its actuarial basis and further deprive doctors of the payments they are entitled to.

8.  Defendants collectively insure such a large pool of patients that they are able to perpetuate this scheme through their combined economic power and market dominance.

## JURISDICTION AND VENUE

9.  This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§ 1961, 1962 and 1964, and 28 U.S.C. §§ 1331 and 1367.  The Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d).

3

10.    Venue is proper in this district pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b).

## PARTIES

### THE INDIVIDUAL PLAINTIFFS

11.    Plaintiff Thomas Backer, M.D., a cardiologist, is a resident of Georgia and a citizen of the United States.   During material times Dr. Backer has provided and billed for medical services to insureds of Humana, CIGNA, Prudential, United and WellPoint, pursuant to contract, and to insureds of CIGNA and WellPoint outside of any contractual relationship.

12.    Plaintiff Jeffrey Book, D.O., a family practitioner, is a resident of Florida and a citizen of the United States.   During material times Dr. Book has provided and billed for medical services to insureds of CIGNA and Humana pursuant to contract, has provided medical services to insureds of PacifiCare pursuant to capitation agreement, and has treated the insureds of Aetna, United, Prudential and Foundation outside of any contractual relationship.

13.    Plaintiff Lance R. Goodman, M.D., a pediatrician, is a resident of Georgia and a citizen of the United States.   During material times Dr. Goodman has provided and billed for medical services to insureds of Coventry, Aetna, United, Prudential, CIGNA, Humana and WellPoint pursuant to contract.

14.    Plaintiff Susan Hansen, M.D., a neurologist, is a resident of California and a citizen of the United States.   During material times Dr. Hansen, through her professional association,

has provided and billed for medical services to insureds of CIGNA, United, Prudential, Humana, WellPoint, PacifiCare and Foundation outside of any contractual relationship

15.    Plaintiff H. Robert Harrison, M.D., a pediatrician and infectious disease specialist, is a resident of Georgia and a citizen of the United States.   During material times Dr. Harrison has

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

provided and billed for medical services to insureds of Coventry, United, Prudential, CIGNA, Humana and WellPoint pursuant to contract.

16.    Plaintiff Glenn L. Kelly, M.D., a vascular surgeon, is a resident of Colorado and a citizen of the United States.  During material times Dr. Kelly has provided and billed for medical services to insureds of CIGNA and United pursuant to contract.

17.    Plaintiff Leonard J. Klay, M.D., an OB/GYN, is a resident of California and a citizen of the United States.  During material times Dr. Klay has provided medical services to insureds of CIGNA, Foundation, United, Prudential, WellPoint and PacifiCare pursuant to capitation agreement.

18.    Plaintiff Martin Moran, M.D., a pediatrician, is a resident of Georgia and a citizen of the United States.  During material times Dr. Moran has provided and billed for medical services to insureds of Coventry, United, Prudential, CIGNA, Humana and WellPoint pursuant to contract.

19.    Plaintiff Manual Porth, M.D., an orthopedic surgeon, is a resident of Florida and a citizen of the United States.  During material times Dr. Porth has provided and billed for medical services to insureds of CIGNA, United and Prudential pursuant to contract.

20.    Plaintiff Charles B. Shane, M.D., a gynecologist, is a resident of Kentucky and a citizen of the United States.  During material times Dr. Shane has provided and billed for medical services to insureds of Humana and Anthem pursuant to contract.

21.    Plaintiff Andres Taleisnik, M.D., an orthopedic surgeon, is a resident of California and a citizen of the United States.  During material times Dr. Taleisnik has provided and billed for medical services to insureds of CIGNA, United, Prudential, WellPoint, Foundation and PacifiCare pursuant to contract, has provided medical services to insureds of Humana pursuant to capitation agreement, and has provided medical services to insureds of CIGNA, Humana,

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

Prudential, PacifiCare, United, WellPoint and Foundation outside of any contractual relationship.

22.    Plaintiff Julio Taleisnik, M.D., an orthopedic surgeon, is a resident of California and a citizen of the United States.  During material times Dr. Taleisnik has provided and billed for medical services to insureds of United, Prudential, WellPoint, Foundation and PacifiCare pursuant to contract, and to insureds of CIGNA, Humana, Prudential, PacifiCare, United, Foundation and WellPoint outside of any contractual relationship.

23.    Plaintiff Roger Wilson, M.D., an orthopedic surgeon, is a resident of California and a citizen of the United States.  During material times Dr. Wilson has provided and billed for medical services to insureds of United, CIGNA, Prudential, PacifiCare and WellPoint pursuant to contract, and to insureds of CIGNA, Humana, Prudential, PacifiCare, United, Foundation and WellPoint outside of any contractual relationship.

**THE ASSOCIATIONAL PLAINTIFFS**

24.    The medical associations set forth below (the "Associational Plaintiffs") are participating in this lawsuit on behalf of their members.  They seek, where their members are entitled to do so and the claims for relief otherwise permit, the Court's declaratory and injunctive relief as set forth below.

**California Medical Association**

25.    The California Medical Association ("CMA") is a non-profit, incorporated professional association of California physicians, with its principal place of business in San Francisco, California.  CMA is comprised of more than 30,000 physicians, including California physicians in the private practice of medicine in all specialties.

26.    CMA's primary purposes, as set forth in its bylaws, are to promote the art and science of medicine, the care and well being of patients, the protection of the public health and

the betterment of the medical profession.  CMA is duly authorized to bring this action against Health Net, PacifiCare and WellPoint on its own behalf and on behalf of its members, and whenever it is included as a plaintiff in any count it seeks relief only against these Defendants. Many of CMA's members do not have the time or resources to pursue this litigation and fear retribution if they become named Plaintiffs.   In addition, Defendants have caused CMA to expend its own resources fighting their tactics.

### Texas Medical Association

27.   The Texas Medical Association ("TMA") is a private, voluntary, incorporated nonprofit professional association of physicians.  The TMA was founded in 1853 to serve the people of Texas in matters of medical care, prevention and cure of disease, and improvement of public health.

28.   Today, TMA's maxim is "Physicians Caring for Texas."  Its over 37,000 members, representing more than 83% of all licensed physicians and medical students in Texas, practice in all fields of medical specialization.

29.   TMA is duly authorized to bring this action on its own behalf and on behalf of its members against Humana, and whenever it is included as a plaintiff in any count it seeks relief only against these Defendants.  Many of TMA's members do not have the time or resources to pursue this litigation and fear retribution if they become named Plaintiffs.   In addition, Defendants have caused TMA to expend its own resources fighting their tactics.

### Medical Association of Georgia

30.   The Medical Association of Georgia ("MAG") is a non-profit, voluntary professional association of Georgia physicians.  MAG was founded in 1849, is an affiliate of the American Medical Association, and is the largest physician association in Georgia.  Presently, MAG has over 8,000 members -- more than 5,000 of whom are physicians actively practicing medicine in

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

the State of Georgia.

31.   MAG was founded to promote the art and science of medicine and the improvement of public health.  With these ends in mind, MAG actively works to advocate physician and patient positions in the United States Congress, the Georgia General Assembly, before state and federal courts, and in the private sector with large health plans, hospitals and other entities that significantly affect patient care.

32.   MAG is duly authorized to bring this action on its own behalf and on behalf of its members against Defendants Coventry, Prudential and United, and whenever it is included as a plaintiff in any count it seeks relief only against these Defendants.  Many of MAG's members do not have the time and resources to pursue this litigation and fear retribution if they become named Plaintiffs.   In addition, by creating financial hardships on doctors, Defendants have caused MAG to lose membership and to expend its own time and resources fighting their tactics.

### Florida Medical Association

33.   The Florida Medical Association ("FMA") is a not for profit corporation, which is organized and maintained for the benefit of the approximately 16,000 licensed Florida physicians who comprise its membership.

34.   The FMA was created and exists for the purposes of securing and maintaining the highest standards of practice in medicine and furthering the interests of its members. One of the primary purposes of the FMA is to act on behalf of its members by representing their common interests before various governmental entities and before state and federal courts.   The FMA is duly authorized to bring this action on its own behalf and on behalf of its members.   Many of FMA's members do not have the time or resources to pursue this litigation and fear retribution if they become named Plaintiffs.   In addition, Defendants have caused FMA to expend its own resources fighting their tactics.

### Louisiana State Medical Society

35.   The Louisiana State Medical Society ("LSMS") is a non-profit, incorporated professional association of physicians, with its principal place of business in Baton Rouge, Louisiana. The LSMS was founded in 1878 and represents physicians of all medical specialties.

36.   The LSMS represents over 6,800 physicians and medical students. It is the mission of the LSMS to provide leadership for the advancement of the health of the people of Louisiana and to serve as the premier advocate for patients and physicians.

37.   The LSMS is duly authorized to bring this action on its own behalf and on behalf of its members against Defendant Coventry, and whenever it is included as a plaintiff in a count it seeks relief only against Coventry. Many of LSMS's members do not have the time or resources to pursue this litigation and fear retribution if they become named Plaintiffs. In addition, Defendants have caused LSMS to expend its own resources fighting their tactics.

### DEFENDANTS

38.   Defendants pay doctors in two basic ways – pursuant to capitation agreements and on a fee for service basis. Regardless of the method of payment, all of the substantive practices, policies, and procedures of the Defendants' health plans are established, implemented, monitored and ratified by the Defendants themselves. Local subsidiaries or affiliates of the named Defendants do not function as independent corporate entities but rather have an alter-ego relationship with the named Defendants and function as agents under the Defendants' direction and control.

39.   When the Defendants pay capitation, they sometimes delegate certain functions to independent physicians' associations ("IPAs"), including claims handling. The IPAs then carry out the delegated functions on behalf of and at the direction of the Defendants pursuant to mandated policies and procedures. The IPAs are monitored and audited by the Defendants, and

the delegated functions may be revoked at any time. In performing these delegated functions the IPAs are mere conduits through which the Defendants conduct business. The IPAs are not co-conspirators of the Defendants and, lacking the requisite intent, do not aid and abet the unlawful conduct described herein.

40.   Whenever this Complaint alleges that any Defendant did any act or thing, it is meant that it, its directors, officers, agents, or employees, or the directors, officers, agents or employees of its subsidiaries or affiliates, performed or participated in such act or thing, and in each instance that such act or thing was authorized or ratified by, and done on behalf of, that Defendant.

**Anthem**

41.   Anthem, Inc. is an Indiana corporation with its corporate headquarters at 120 Monument Circle, Indianapolis, Indiana. Through its subsidiary Anthem Insurance Companies, Inc., also an Indiana corporation, Anthem, Inc. provides health services to the public on a nationwide basis through numerous health care plans, most notably the Blue Cross and Blue Shields of Colorado, Indiana, Kentucky, Ohio, Nevada, Maine, New Hampshire and Connecticut. Anthem, Inc., its subsidiaries and health care plans are collectively referred to as "Anthem" in this Complaint.

42.   At all relevant times all Anthem entities and health care plans were the agents of the other Anthem entities and health care plans, and in committing the acts alleged herein acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interests and the interests of other Defendants they aided and abetted, and with whom the conspired, as set forth below. In addition, the actions alleged herein were ratified and approved by the other Anthem entities even though they may have been contrary to corporate policy.

10

## Coventry

43.   Defendant Coventry Health Care, Inc. is a corporation based in Bethesda, Maryland, with corporate headquarters at 6075 Rockledge Drive, Suite 900, Bethesda, Maryland, 20817.  It is the parent corporation of a number of subsidiaries that provide health care services through health care plans on a nationwide basis to over 1.5 million members in 15 markets.  Coventry Health Care, Inc., its subsidiaries and health care plans are collectively referred to as "Coventry" in this Complaint.

44.   At all relevant times, all Coventry entities and health care plans were the agents of the other Coventry entities and health care plans, and in committing the acts alleged herein, they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interests and those of the other Defendants they aided and abetted, and with whom they conspired, as more fully described below.  In addition, the actions alleged herein were ratified and approved by the other Coventry entities even though they may have been contrary to corporate policy.

## Health Net

45.   Defendant Health Net, Inc. is a Delaware corporation with corporate headquarters at 21650 Oxnard Street, Woodland Hills, California, 91367.  In 1998, Foundation Health Systems, Inc. ("Foundation") merged with Health Net, and any reference in this Complaint to Health Net includes Foundation and any reference to Foundation includes Health Net.  Health Net is the parent corporation of a number of subsidiaries that provide health care services through health care plans on a nationwide basis.  Health Net, its subsidiaries and health care plans are collectively referred to as "Health Net" in this complaint.

46.   At all relevant times all Health Net entities and health care plans were the agents of the other Health Net entities and plans, and in committing the acts alleged herein, they acted

11

within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of both their interests and the interests of other Defendants they aided and abetted, and with whom they conspired, as more fully set forth below. In addition, the actions alleged herein were ratified and approved by the other Health Net entities even though they may have been contrary to corporate policy.

## Humana

47.    Defendant Humana, Inc. ("Humana") is a Delaware corporation with corporate headquarters at 500 West Main Street, Louisville, Kentucky 40202.

48.    Defendant Humana Health Plan, Inc. ("HHP") is also a Delaware corporation with corporate headquarters at 500 West Main Street, Louisville, Kentucky 40202.

49.    Humana, Inc. and/or HHP, directly or through subsidiaries, provide health care services on a nationwide basis by offering and operating health care plans. Humana, Inc., HHP, their subsidiaries, other entities controlled by them and the Humana health care plans are referred to as "Humana" in this Complaint.

50.    At all relevant times all Humana Defendants, entities and health care plans were the agents of the other Humana Defendants, entities and health plans, and in committing the acts alleged herein they acted within the scope of their agency, and in furtherance of both their interests and the interests of other Defendants they aided and abetted, and with whom they conspired, as set forth below. In addition, the actions alleged herein were ratified and approved by each Humana entity even though they may have been contrary to corporate policy.

## PacifiCare

51.    Defendant PacifiCare Health Systems, Inc. is a Delaware corporation with its headquarters located at 33120 Lake Center Drive, in Santa Ana, California. It is the parent corporation of a number of subsidiaries that provide health care services through health care

12

plans on a nationwide basis.   PacifiCare Health Systems, Inc., its subsidiaries and health care plans are collectively referred to as "PacifiCare" in this Complaint.

52.   At all relevant times all PacifiCare entities and health care plans were agents of the other PacifiCare entities and plans, and in committing the acts alleged herein, they acted within the scope of their agency, with the consent, permission, authorization and knowledge of their others, and in furtherance of both their interests and the interests of the other Defendants they aided and abetted, and with whom they conspired, as set forth below.   In addition, the actions alleged herein were ratified and approved by each Humana entity even though they may have been contrary to corporate policy.

### Prudential

53.   Defendant Prudential Insurance Company of America is a Delaware corporation with its corporate headquarters in Newark, New Jersey.   It is also the parent corporation of Prudential Health Care Plan, Inc. and other subsidiaries that provide health care services to the public on a nationwide basis through health care plans.   Prudential Insurance Company of America, its subsidiaries and health care plans are collectively referred to as "Prudential" in this Complaint.

54.   On or about August 6, 1999, Defendant Aetna-UHSC, Inc. acquired the managed care operations of Prudential.   Any post August 6, 1999 allegations which involve those health plans thus refer to Aetna rather than Prudential.

55.   At all relevant times all Prudential entities and health care plans were the agents of the other Prudential entities and health care plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of their interests and the interests of the other Defendants they aided and abetted, and with whom they conspired, as set forth below.   In

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

addition, the actions of each Prudential entity alleged herein were ratified and approved by the other Prudential entities even though they may have been contrary to corporate policy.

## United

56.   Defendant United Health Group is a Minnesota corporation with headquarters at 300 Opus Center, 9900 Bren Road East in Minnetonka, Minnesota.

57.   Defendant United Health Care is a subsidiary of United Health Group that operates organized health systems.

58.   Defendants United Health Group and United Health Care, directly or through subsidiaries, provide health care services nationwide through health care plans.   United Health Group, United Health Care, their subsidiaries and health care plans are referred to as "United" in this Complaint.

59.   At all relevant times all United entities and health care plans were the agents of the other United entities and plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of their interests and those of other Defendants they aided and abetted, or with whom they conspired, as set forth below.   In addition, the actions of each United entity alleged herein were ratified and approved by the other United entities even though they may have been contrary to corporate policy.

## WellPoint

60.   Defendant WellPoint Health Networks, Inc. is a California corporation with corporate headquarters at One WellPoint Way, Thousand Oaks, California 91362.   It provides, directly and through a number of subsidiaries, including Blue Cross of California, Blue Cross and Blue Shield of Georgia, Blue Cross and Blue Shield of Missouri and Unicare, health care services on a nationwide basis through health care plans.   WellPoint Health Networks, Inc., its

subsidiaries and health care plans are collectively referred to as "WellPoint" in this Complaint.

61.  At all relevant times all WellPoint entities and health care plans were the agents of the other WellPoint entities and plans, and in committing the acts alleged herein they acted within the scope of their agency, with the consent, permission, authorization and knowledge of the others, and in furtherance of their interests and the interests of the other Defendants they aided and abetted, or with whom they conspired, as set forth below.  In addition, the actions of each WellPoint entity alleged herein were ratified and approved by the other WellPoint entities even though they may have been contrary to corporate policy.

## FACTUAL ALLEGATIONS COMMON TO ALL OR MULTIPLE COUNTS AGAINST ALL DEFENDANTS

### FEE FOR SERVICE CONTRACTS AND NONCONTRACT DOCTORS

62.  Plaintiffs and class members provide medical services to Defendants' insureds on a fee for service basis both pursuant to and without contracts.   These services are provided based upon the fundamental premise that, if the services are covered by Defendants and are medically necessary, the Plaintiffs and class members will be compensated in a timely manner for rendering those services.

63.  Each fee for service contract Defendants enter into, as well as the accompanying material they provide, represents that doctors will be paid in a timely manner for rendering covered, medically necessary services to Defendants' insureds in accordance with standard medical coding procedures.

64.  Defendants also represent to the medical profession at large that they will pay doctors in a timely manner for rendering covered, medically necessary services to their insureds. These representations are made in numerous ways, including:

(a) By providing in their insureds' plans or policies that doctors both within and without

15

defined networks will be compensated for rendering covered, medically necessary services;

(b) By providing insurance cards to their insureds to show treating doctors;

(c) By disseminating billing information to the profession at large;

(d) By confirming coverage for medically necessary services when contacted by doctors prior to treatment;

(e) By insisting that payment requests describe the covered, medically necessary services rendered in a standard coded fashion;

(f) By explaining payments so as to make it appear that doctors are being paid for the covered, medically necessary services they render; and

(g) By operating in jurisdictions which require timely payment by law.

65.   In addition, although it goes to the heart of the relationship, and is necessary to prevent doctors from being misled by their apparent actions and statements, Defendants fail to disclose that the automated processing schemes described in paragraphs 84-96 will be used to deny, diminish and delay payment for covered, medically necessary services.   At best, Defendants state only that automated programs will be used to "correct" improper coding and payment requests – yet another misrepresentation.

66.   Following the provision of medical services on a fee for service basis, whether pursuant to contract or otherwise, Plaintiffs and class members are required to submit a standard coded claim form.

67.   By far the most commonly used form is the HCFA-1500, which was developed by the Health Care Financing Administration in conjunction with the American Medical Association ("AMA") for use in the Medicare and Medicaid programs.   The Health Care Financing Administration is now known as the Center for Medicare and Medicaid Services

("CMS"), and the HCFA-1500 form is now known as the CMS-1500. The HCFA/CMS-1500 form incorporates the AMA's Current Procedural Terminology, or CPT coding procedure, and includes a code identifying the diagnosis and procedure performed as well as modifiers for the degree of difficulty, complexity and multiplicity.

68. The purpose of the coded information contained on the HCFA/CMS-1500 and other standard claim forms is to provide a uniform language that accurately describes the medical, surgical and diagnostic services a doctor has rendered, and to give Defendants or their designated payors the information they need to process a claim for payment.

69. Each Plaintiff and class member relies upon Defendants' representations, both express and implied, that they will be paid for rendering covered, medically necessary services by, *inter alia*, providing those services, by not billing the insured, and by requesting payment for those services from the Defendants or a designated payor in the manner required by the Defendants, i.e. using the HCFA/CMS-1500 or other prescribed standard claims form and standardized coding.

70. However, the uniform coding process embodied in these forms allows automated logic to be applied to physician payment requests, and rather than paying Plaintiffs and class members for covered, medical necessary services in accordance with standard coding practices, Defendants engage in a common fraudulent scheme designed to systematically deny, delay and diminish payments to Plaintiffs and class members using the devices and techniques set forth below. Each of the Plaintiffs and class members have been victimized by these schemes.

### Denial of Payment Requests Based Upon Cost Criteria Rather Than Coverage and Medical Necessity

71. Defendants secretly do not use "medical necessity" or coverage as the criteria for making payment decisions. Instead, they use cost-based or other actuarial criteria unrelated to medical necessity to approve or deny claims submitted by Plaintiffs and the class. For example,

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

Humana routinely and automatically denies payment for certain CPT codes without any inquiry into or analysis of medical necessity.  These undisclosed cost-based criteria include Defendants' own guidelines and criteria as well as guidelines developed in concert with third parties, including but not limited to Milliman & Robertson and InterQual.

72.  Defendants systematically deny valid claims submitted for payment by Plaintiffs and class members on this basis.

### Downcoding and Bundling

73.  Defendants have also implemented systematic claims processes to manipulate the CPT codes contained in the claims forms submitted by Plaintiffs and class members by "downcoding" or "bundling" claims.  To accomplish this Defendants use software sold and licensed by McKesson HBOC, or comparable software capable of modifying CPT code protocols set by the American Medical Association.

74.  "Downcoding" denies or diminishes the payment of claims submitted by physicians by arbitrarily, and without prior notice, changing the code assigned to a particular service to a less expensive one.

75.  "Bundling" denies or diminishes the payment of claims submitted by physicians by arbitrarily, and without prior notice, combining the codes of two or more procedures into one.

76.  These processes are not used, as Defendants would have it, to correct improper coding, but to cheat doctors out of payment for services rendered.

### Refusal To Recognize Modifiers

77.  Defendants' automated processing systems also manipulate the data contained on HCFA/CMS-1500 or other standard claims forms by refusing to recognize "modifiers" – codes which indicate the degree of multiplicity, complexity or difficulty of the evaluation or procedure at issue.

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

78.  Rather than compensate Plaintiffs and class members for the services reflected by these enhancement codes, or question them on the basis of medical necessity, they are simply ignored.

79.  Nothing in standard coding guidelines requires the submission of additional documentation when modifiers are used, or permits them to be ignored.

## Payment Delay

80.  In addition to denying and diminishing payments to Plaintiffs and class members, Defendants also intentionally delay them.

81.  One way this is done is through automated programs that "pend" claims, i.e. put them in a state of suspense before they are processed even though no additional information is needed or requested from Plaintiffs and class members.

82.  Delay is also accomplished through calculated understaffing.

83.  The end result is that average payment times exceed by multiples the time provided for by law in most states as well as the time set by contract and industry practice.  This provides the Defendants with a significant float and deprives Plaintiffs and class members of the time value of their money as well as one of the incentives to treat patients at reduced rates in a managed care context.

## Explanation of Benefits/Fraudulent Concealment

84.  Once Plaintiffs' and class members' payment requests have been improperly denied or diminished, Defendants provide Plaintiffs and class members with an explanation of benefits ("EOB").

85.  Through coded explanations, the EOBs misrepresent or conceal the actual manner in which Plaintiffs' and the class members' payment requests were processed so as to induce them to accept reduced payments in reliance thereon.

86.   Defendants also conceal the manner in which they actually process requests for payment by refusing to disclose it, by taking affirmative steps to keep it secret, and by depriving Plaintiffs and class members of information that might enable them to discover their processing techniques, including such basic information as the schedule of fees in effect for various procedures.

87.   As a result of Defendants' fraudulent concealment, the applicable statutes of limitations have been tolled or have not begun to run.

## CAPITATION AGREEMENTS

88.   Defendants also enter into capitation agreements with Plaintiffs and class members through the groups in which they practice or through IPAs – associations of independent physicians or physician groups that deal collectively with one or more of the Defendants on their behalf.

89.   The principal feature of capitation agreements is that doctors are paid based on the number of patients they agree to treat rather than on a fee for service basis, the premise being that, if doctors practice efficient, preventative medicine, capitation payments will fairly compensate them and their patients will receive better and more affordable health care.

90.   When Defendants enter into capitation agreements they expressly or impliedly represent to Plaintiffs and class members, or to IPAs on their behalf, that the capitation rates are actuarially sound, and that they will be set based upon the covered, medically necessary services the group is actually required to render.  Undisclosed, however, are the criteria actually used to set payments, including administrative costs, and the techniques Defendants use to manipulate the capitation system so that funds will never be available to fairly compensate the doctors.

91.   For example, Defendants represent that Plaintiffs, the class or the IPAs will receive monthly payments for each patient enrolled in the group they are to treat.  In addition, capitation

rolls, which supposedly list the universe of enrolled patients, are sent to Plaintiffs, class members or the IPAs on a monthly basis.

92.   The capitation rolls do not, however, include all of the patients who have enrolled in the plan.  Instead, Defendants withhold payments for insureds who are enrolled in a plan but have yet to seek any treatment, thus dramatically altering the actuarial underpinnings of the capitation agreement by withholding payments for "well" members that are needed to offset the cost of treating the sick.

93.   Defendants also reduce Plaintiffs' and class members' capitation payments by misrepresenting the workings of "pharmacy risk pools."  The capitation agreements state that the Defendants will pay for prescription drugs for insureds and charge a risk fund, which ultimately reduces capitation payments, the "actual cost" of the prescription drugs.  In actuality, however, Defendants charge the fund a set price that does not reflect the substantial rebates/refunds/discounts granted by drug manufacturers, does not represent Defendants' "actual cost," and operates to artificially reduce capitation payments.

94.   Defendants' capitation agreements also state that they will pay incentives to the Plaintiffs and members of the class at the end of each year if charges against the pharmacy risk pool are under projections.  Undisclosed, however, is the fact that Defendants "adjust" year-end statements to avoid paying the incentives.  The adjustments are reflected in year-end statements sent to Plaintiffs, class members and/or their IPAs.

95.   Finally, during each capitation year doctors submit HCFA/CMS-1500 or other standard coded forms reflecting the covered, medically necessary services they have rendered to patients enrolled in the group.  Defendants manipulate the coded information on these forms in the same way they do with fee for service providers, and use the resulting data to reduce capitation payments the following year.

21

96.   Plaintiffs and the class rely upon the Defendants capitation misrepresentations by agreeing to treat, and treating, patients on a capitated basis, by accepting reduced monthly capitation payments based on false lists of enrolled patients, by accepting inflated charges against their capitation payments based upon false drug costs, and by accepting the lack of incentive payments based upon false year-end statements.

97.   Plaintiffs and class members operating under capitation agreements are harmed in the following ways.  First, even under capitation agreements, Defendants pay for some services on a fee for service basis, and in those instances doctors are subjected to the same automated processing schemes described above.   Second, Plaintiffs and class members also submit HCFA/CMS-1500 or other standard coded forms to IPAs to receive individual or group payments for rendering covered, medically necessary services from the capitation fund.   The forms are processed using the same automated programs to deny and reduce payment, and, when the capitation fund runs dry, there is no payment at all.  Finally, to the extent that Plaintiffs and members of the class share directly in capitation payments, they are not fully or fairly compensated for the services they render because the capitation payments have been fraudulently reduced in the manner described in this section.

98.  Defendants not only fail to disclose the fraudulent capitation practices described in this section, they take affirmative steps to conceal them, thereby tolling the running of any relevant limitation period.

## COERCIVE USE OF ECONOMIC POWER

99.  Defendants collectively control a majority of the subscribers and providers in the managed care market.

100.   In order to perpetuate the above scheme and continue to confiscate Plaintiff's and the class members' property, Defendants use their overwhelming economic power and market

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

dominance to coerce Plaintiffs and the class, at the risk of being denied patient referrals and/or "black-listed" altogether, into providing care under Defendants' policies and practices on a "take it or leave it" basis, and providing care on a capitated as opposed to fee for service basis pursuant to "all products" requirements.

101.   Defendants further wield their economic power and market dominance in a coercive manner by reserving the right to unilaterally amend contracts with physicians, refusing to provide information concerning pricing or fee structures to Plaintiffs or class members, and failing to provide any feasible mechanism for review of the automated payment reductions – all in furtherance of the scheme described above.

102.   Defendants' extortionate conduct is made more effective by, and enforced through, the conspiracy and RICO enterprise described below as well as Defendants' efforts to aid and abet each other in confiscating Plaintiffs' and class members' property.

## CONSPIRACY

103.   Defendants have not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy, which includes not only the Defendants but other managed care and health insurance companies such as Aetna, CIGNA, Health Care Service Corporation, which owns and operates Blue Cross and Blue Shield of Illinois and Blue Cross and Blue Shield of Texas, and the Regence Group.

104.   Each Defendant and members of the conspiracy, with knowledge and intent, agreed to the overall objective of the conspiracy, agreed to commit acts of fraud and extortion to relieve Plaintiffs of their rightful compensation, and actually committed such acts.

105.   Indeed, for the fraudulent schemes described above to be successful, each Defendant and other members of the conspiracy had to agree to enact and utilize the same devices and fraudulent tactics against the Plaintiffs and members of the class.   If only one

Defendant engaged in these activities, physicians could and would refuse to do business with that Defendant, but together Defendants have the power and influence necessary to affect and perpetuate their scheme.

106.    Numerous common facts and similar activities, which reflect the above reality and imply the existence of a conspiracy, exist among all of the Defendants and other members of the conspiracy, including:

     (a)     the payment provisions in fee for service contracts;

     (b)     the terms of capitation agreements;

     (c)     the claims procedures, including the data physicians are required to provide in submitting claims, the forms they must submit the data on, and the coding they must use to submit the data;

     (d)     medical necessity criteria, and Defendants' use of guidelines developed in concert with third parties;

     (e)     the automated processes used in manipulating CPT codes, including downcoding and bundling;

     (f)     the deliberate purchasing of software systems that do not recognize modifiers;

     (g)     refusing to give doctors fee schedules;

     (h)     institutionalized techniques to delay payment of claims;
     (i)     the payment procedures under capitation agreements, including but not limited to:

        (1)  retaining premiums from enrolled insureds until they need services from physicians;

        (2)  the manipulation of "pharmacy risk pools;"

        (3)  failing to pass along pharmaceutical rebates and discounts.

107.    During the past ten years the conspiracy was conducted through and implemented by:

     (a)     the development and adoption of specific clinical practice guidelines and related healthcare review criteria such as those established by Milliman & Robertson and InterQual;

24

(b)    the development and utilization of automated and integrated claims processing and other systems such as those generated by McKesson HBOC, Ingenex and FACTS Services, Inc., and the configuration and use of such systems to similarly deny, diminish and delay payments to physicians;

(c)    the joint development of accreditation standards and industry information by the National Committee for Quality Assurance;

(d)    the utilization, participation in development and purchase of reimbursement guidelines such as those offered by the Health Insurance Association of America;

(e)    participation and coordination in trade associations, such as the Health Insurance Association of America and the American Association of Health Plans, that develop common industry standards and/or act as vehicles for the exchange of sensitive business information;

(f)    participation and coordination in industry groups such as the Coalition for Quality Healthcare and Integrated Health Care Organization that disseminate unified information and messages; and

(g)    participation in and coordination through private, jointly owned corporations such as MedUnite which facilitate Defendants' claims processing procedures.

## THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF

108.   Defendants' automated scheme to deny, reduce and delay payments to doctors who treat their insureds on a fee for service basis, and their use of the same automated programs as well as other manipulative devices to reduce capitation payments due doctors working under capitation agreements, are ongoing problems that will continue to cause Plaintiffs and members of the class economic losses and threaten their ability to practice medicine and serve the public health.

109.   A money judgment in this case will only compensate Plaintiffs and members of the class for past losses.  It will not stop Defendants' interference in medical treatment decisions, and it will not stop the Defendants from continuing to confiscate the money doctors earn, and

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

that is necessary to maintain their practice on an ongoing basis.

110.   A money judgment in this case will only compensate Plaintiffs and members of the class for past losses.   It will not stop Defendants' interference in medical treatment decisions, and it will not stop the Defendants from continuing to confiscate the money doctors earn, and that is necessary to maintain their practice on an ongoing basis.

111.   No individual doctor has a practical or adequate remedy, either administratively or at law, to recover these future losses.   The costs of pursuing such claims far exceeds the amount at issue.

112.   Even a class action such as the one contemplated in this case is a monumental undertaking that cannot be mounted on a regular basis.

113.   Where multiple lawsuits are required to redress repeated statutory violations, breaches of contract or other wrongs, there is no adequate remedy at law and irreparable harm exists.

## **RICO ALLEGATIONS**

### **The Managed Care Enterprise**

114.   Plaintiffs, the class members and Defendants are  "persons" within the meaning of 18 U.S.C. § 1961(3).

115.   Based upon Plaintiffs' current knowledge, the following persons constitute a union or group of individuals associated in fact that Plaintiffs refer to as the "Managed Care Enterprise" ("MCE"): (1) Defendants; (2) other health insurance companies not named as defendants herein, including Aetna, CIGNA, Health Care Service Corporation and the Regence Group; (3) Milliman & Robertson and InterQual, third party entities which promulgate purported patient care guidelines; (4) HBOC McKesson, Ingenex, Facts Services and other third party entities which develop claims processing systems or components; (5) American Association of

Health Plans and the Health Insurance Association of America, Defendants' trade associations; (6) MedUnite, an entity created by Defendants and their trade association to facilitate claims processing; and (7) the Coalition for Affordable Quality Healthcare.

116.  The MCE is an ongoing organization which engages in, and whose activities affect, interstate commerce.

117.  While the Defendants participate in and are members and part of the MCE, and are a part of it, they also have an existence separate and distinct from the enterprise.

118.  In order to successfully retain monies owed physicians in the manner set forth above, Defendants need a system that allows them to manipulate and control reimbursements to physicians and conceal the manner in which that is done. The MCE provides Defendants with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme. The Defendants control and operate the MCE as follows:

(a)     By developing themselves, and engaging and paying Milliman & Robertson and InterQual to develop, generalized standards and "patient care guidelines" to use as actual criteria to systematically deny claims without regard to medical necessity or coverage;

(b)     By agreeing to use and using those guidelines to deny claims;

(c)     By engaging and paying HBOC McKesson, Ingenex and Facts Services to develop automatic systems for editing and manipulating the claims information contained in the HCFA/CMS 1500 form;

(d)     By agreeing to and using those systems to process claims and deny or diminish payment;

(e)     By utilizing and supporting trade associations – the American Association of Health Plans ("AAHP") and Health Insurance Association of America ("HIAA")

– as vehicles for communication and the exchange and dissemination of information necessary to the scheme, or, in the words of AAHP, to "unify the industry voice" and deliver a "unified message";

(f)    By participating in the use of, and more recently creating MedUnite as, a common entry point for physician claim data to assist the Defendants in processing doctors' claims in a coordinated fashion;

(g)    By utilizing the Coalition for Quality Healthcare to exchange and disseminate information, take joint action and conceal their wrongdoing.  According to the coalition's own Web site, the CEO's of the nation's largest health plans approve all joint actions of the Coalition.

(h)    By exchanging upper level employees to facilitate unified and concerted action. For example, Aetna's chief medical officer, Dr. William C. Popik, was until February of 2001 CIGNA's senior vice president, national medical director, and representative to MedUnite.  Similarly, Aetna's executive vice president and chief of health operations, Ronald Williams, was a WellPoint group president.

119.   As set forth above, the MCE has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

## Predicate Acts

120.   Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).  As set forth below, Defendants have and continue to engage in conduct violating each of these laws to effectuate their scheme.

121.   In addition, in order to make their scheme effective, each of the Defendants sought to and did aid and abet the others' in violating the above laws within the meaning of 18 U.S.C.

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

§2. As a result, their conduct is indictable under 18 U.S.C. §§ 1341 and 1343 on this additional basis.

## Violations of 18 U.S.C. §§ 1341 and 1343

122. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to agreements, manuals, correspondence, patient lists, payments, EOBs, reports, data, summaries, statements, and plan materials.

123. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things which include but are not limited to agreements, manuals, correspondence, patient lists, payments, EOBs, reports, data, summaries, oral and written statements, faxes, and plan materials.

124. The matter and things sent by Defendants via the Postal Service, commercial carrier, wire or other interstate electronic media include, inter alia:

   a)   material containing false and fraudulent misrepresentations that Defendants would pay Plaintiffs and class members for the covered, medically necessary services they provided to Defendants' insured;

   b)   material containing the false and fraudulent misrepresentations concerning capitation payments described in paragraphs 103-108 above,

including lists of capitation patients purportedly assigned to a physician which fail to list all patients assigned in order to avoid the obligation of making capitation payments for those individuals as well as capitation lists that collectively fail to include all patients enrolled in a plan;

c)   material which concealed or failed to disclose that Defendants would and did use the techniques and procedures described in paragraphs 84-96 above to deprive Plaintiffs and class members of payment, including the use of cost based criteria rather than medical necessity and coverage to make payment decisions, downcoding, bundling, refusing to recognize modifiers and intentionally delaying payments;

d)   material which concealed or failed to disclose the manner in which capitation payments would be manipulated as described in paragraphs 103-108 above; and

e)   material constituting explanations for payments made or denied by Defendants, but which, in fact, fail to reveal and/or actively conceal the reasons that payment has been denied, diminished, delayed, or otherwise adjusted from the request for payment as submitted by the physician.

125.   Other matter and things sent through or received from the Postal Service, commercial carrier or interstate wire transmission by Defendants included information or communications in furtherance of or necessary to effectuate the scheme.

126.   The Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and the class and obtaining their property for the Defendants' gain.

30

127.    The Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiffs and the class relied on the misrepresentations and omissions as set forth above.

128.    As a result, Defendants have obtained money and property belonging to the Plaintiffs and class members, and Plaintiffs and the class have been injured in their business or property by the Defendants' overt acts of mail and wire fraud, and by their aiding and abetting each other's acts of mail and wire fraud.

### Pattern Of Racketeering Activity

129.    The Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e. indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past ten years.   In fact, each of the Defendants has committed or aided and abetted in the commission of thousands of acts of racketeering activity.   Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and class members.

130.    The multiple acts of racketeering activity which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

131.    Examples of predicate acts committed by Defendants pursuant to their scheme to defraud Plaintiffs and their conspiracy to violate RICO are set forth in the Civil RICO Case Statement Pursuant to Local Rule 12.1, the Supplement to Civil RICO Case Statement Pursuant

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

to Local Rule 12.1, and the Amended Civil RICO Case Statement pursuant to Local Rule 12.1 filed in *In re: Managed Care Litig.*, Case No. 00-1334-MD-MORENO.

<u>RICO VIOLATIONS</u>

<u>§ 1962(a)</u>

132.    Section 1962(a) of RICO provides that "it shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... in which such person has participated as a principal within the meaning of § 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce."

133. As set forth above, Defendants receive income from their participation as principals in an extensive pattern of racketeering activity.

134.    That income is reinvested to finance future racketeering activity, and the future operation of the Managed Care Enterprise.   In addition, Defendants use the income to buy additional health insurance companies or plans, which increases the scope and size of the MCE, the reach of their fraudulent scheme, and their power to perpetuate and enforce it.

<u>§ 1962(c)</u>

135.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...."

136. Through the patterns of racketeering activities outlined above, the Defendants have also conducted and participated in the affairs of the MCE.

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

### § 1962(d)

137. Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b) or (c), of this section.

138. Defendants' conspiracy to secure money due the Plaintiffs and class members for their own use through the fraudulent and extortionate scheme described above violates 18 U.S.C. §1962(d).

139. Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of Managed Care Enterprise through a pattern of racketeering activity comprised of numerous acts of mail fraud, wire fraud and extortion, and each Defendant so participated in violation of 18 U.S.C. § 1962(c).

140. Each Defendant further agreed to use or invest, directly or indirectly, part of the income derived from their acts of mail fraud, wire fraud and extortion, which constituted a pattern of racketeering activity, in the establishment, operation and expansion of the MCE, and has done so in violation of 18 U.S.C. § 1962(a).

### CLASS ALLEGATIONS

### Class Definitions

141. Plaintiffs bring this action on their own behalf and, pursuant to Fed. R. Civ. P. 23(b)(1)(A), (b)(2), and/or (b)(3), and USDC Southern District of Florida Local Rule 23.1, as a class action on behalf of a nationwide class of persons defined as:

**Global Class:** All medical doctors who, from August 14, 1990 to the date of certification, provided services to any patient insured by any Defendant or by CIGNA. This class seeks certification of claims for declaratory and injunctive relief, and for damages pursuant to 18 U.S.C. § 1962(d) for conspiracy to violate 18 U.S.C. § 1962(a) and 1962(c), and for aiding and abetting in violation of 18 U.S.C. §1962(a) and 1962(c).

33

142.  The Court should also certify the following subclasses:

**National Nonarbitration Subclass:**  All medical doctors who, between August 14, 1990 and the date of certification, provided services to a patient insured by any Defendant pursuant to a contract without an arbitration clause or which contained an unenforceable arbitration clause. This class seeks certification of claims for declaratory and injunctive relief, and for damages based upon direct violations of 18 U.S.C. §§ 1962(a) and (c) and breach of contract.

**National Noncontract Subclass:**  All medical doctors who, between August 14, 1990 and the date of certification, provided services to a patient insured by any Defendant with whom the doctor had no contract covering treatment of that patient.  This class seeks certification of claims for declaratory and injunctive relief, and for damages based upon direct violations of 18 U.S.C. §§ 1962(a) and (c), breach of constructive contract and unjust enrichment.

**Prompt Pay Subclass:**  All medical doctors who, between August 14, 1990 and the date of certification, provided services to any patient insured by a Defendant with whom they had no contract, or with whom they had a contract which contained no arbitration clause, in a State with a prompt-pay statute and received late payment.   This class seeks certification of claims for breach of state prompt-pay statutes.

**California Subclass:**  All medical doctors who, from August 14, 1990 to the date of certification, provided services in California to persons insured by any Defendant pursuant to a contract without an arbitration clause or without a contract.  This class seeks certification of claims for declaratory and injunctive relief, and for restitution pursuant to California Business and Professions Code § 17200.

**Prudential Subclass:**  All medical doctors, who from August 14, 1990 to the date of certification, provided services to the insureds of **Prudential** pursuant to a contract without an

arbitration clause or without a contract. This class seeks certification of claims for breach of the New Jersey Consumer Fraud Act.

## RULE 23(a)

### Typicality

143. The named Plaintiffs and the members of the class and subclasses each and all have tangible and legally protectable interests at stake in this action.

144. The claims of the named class representatives and the absent class and subclass members have a common origin and share a common basis. Their claims originate from the same illegal, extortionate, fraudulent, confiscatory, conspiratorial, and aiding and abetting practices of the Defendants, and the Defendants act in the same way toward the Plaintiffs and the members of the class and subclasses. As such, each named Plaintiff has been the victim of one or more of the following illegal practices at the hands of one or more of the Defendants: cost based automated claims denials, bundling, downcoding, refusal to recognize modifiers; delayed payment of claims; and reduction of capitation payments based upon false patient rolls, false prescription drug charges or manipulation of the capitation process.

145. The proposed class and subclass representatives state claims for which relief can be granted that are typical of the claims of absent class and subclass members. If brought and prosecuted individually, the claims of each class and subclass member would necessarily require proof of the same material and substantive facts, rely upon same remedial theories, and seek the same relief.

146. The claims and remedial theories pursued by the named class representatives are sufficiently aligned with the interests of absent class and subclass members to ensure that the universal claims of the class and subclasses will be prosecuted with diligence and care by the Plaintiffs as representatives of the class and subclasses.

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

**Numerosity**

147.    The members of the class and subclasses are so numerous that joinder of all members is impracticable.    Defendants offer managed care services to over 160 million subscribers and accomplish this through the services of over 500,000 physicians.  The class and subclasses are, however, ascertainable as the names and addresses of all class and subclass members can be identified in business records maintained by the Defendants.

**Commonality**

148.  The questions of law and fact common to the class and subclasses include, *inter alia*.

      a.    Whether Defendants conspired and/or aided and abetted each other in furtherance of the unlawful acts alleged herein;

      b.    Whether Defendants have engaged in mail and wire fraud;

      c.    Whether Defendants engaged in a pattern of racketeering activity;

      d.    Whether the Managed Care Enterprise is an enterprise within the meaning of 18 U.S.C. § 1961 (4);

      e.    Whether Defendants have used or invested income from their racketeering activities to establish or operate the Managed Care Enterprise in violation of 18 U.S.C. § 1962 (a);

      f.    Whether Defendants conducted or participated in the affairs of the Managed Care Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962 (c);

      g.    Whether Defendants' overt and/or predicate acts in furtherance of the conspiracy and/or aiding and abetting and/or direct acts in violation of 18 U.S.C. §§ 1962 (a) and (c) proximately caused injury to the Plaintiffs' and class members' business or property;

      h.    Whether Defendants act and/or refuse to act on grounds generally applicable to the Plaintiffs and class members;

      i.    Whether the Defendants set payment rates which are not sufficient to adequately reimburse physicians on a capitation basis for the provision of health services to plan members, participants, and enrollees;

      j.    Whether Defendants falsify patient rolls in connection with capitation plans;

      k.    Whether Defendants falsify prescription drug costs in connection with capitation plans;

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

l.   Whether Defendants falsely manipulate incentive payments in connection with capitation plans;

m.   Whether Defendants bundle;

n.   Whether Defendants downcode;

o.   Whether Defendants deny claims on automated cost bases rather than coverage and medical necessity;

p.   Whether Defendants refuse to recognize modifiers;

q.   Whether Defendants "pend" claims to delay payment;

r.   Whether Defendants intentionally understaff to delay payments;

s.   Whether Defendants represent that they will pay doctors for rendering covered, medically necessary services;

t.   Whether Defendants fail to disclose the material workings of capitation payments;

u.   Whether Defendants fraudulently conceal their scheme;

v.   Whether Defendants violate their contracts in the same manner;

w.   Whether Defendants impliedly request that noncontract doctors treat their insureds;

x.   Whether noncontract doctors' treatment of Defendants' insureds confers a benefit on Defendants;

y.   Whether Defendants are unjustly enriched by that benefit;

z.   Whether Defendants' conduct in California violates California Business and Professions Code §§ 17200;

aa.   Whether Defendant Prudential's conduct violates the New Jersey Consumer Fraud Act.

## Adequate Representation

149.   The named Plaintiffs are willing and prepared to serve the Court and proposed class and subclasses in a representative capacity with all of the obligations and duties material thereto. The Plaintiffs will fairly and adequately protect the interest of the class and have no interests adverse to, or which directly and irrevocably conflict with, the interests of other members of the class.

150.   The self-interests of the named class representatives are co-extensive with and not antagonistic to those of the absent class members. The proposed representatives will undertake

to well and truly protect the interests of the absent class members.

151.   The named plaintiffs have engaged the services of counsel indicated below.   Said counsel are experienced in complex class litigation, will adequately prosecute this action, and will assert, protect and otherwise well represent the named class representatives and absent class members.

## RULE 23(b)(1)(A) AND (B)

152.   The prosecution of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to the action, or could substantially impair or impede their ability to protect their interests.

153.   The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the parties opposing the class. Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow to exist inconsistent and incompatible rights within the plaintiff class.

## RULE 23(b)(2)

154.   The Defendants have acted or refused to act on grounds generally applicable to the class, making final declaratory or injunctive relief appropriate.

## RULE 23(b)(3)(2)

155.   The questions of law and fact common to members of the class and subclasses predominate over any questions affecting only individual members.

156.   A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that:

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

(a)     Individual claims by the class members are impractical as the costs of pursuit far exceed what any one plaintiff or class member has at stake.

(b)     As a result, although multiple class actions have been filed, there has been very little individual litigation over the controversies herein, and individual members of the class have no interest in prosecuting and controlling separate actions.

(c)     As evidenced by the actions of the Panel on Multi District Litigation in this case, it is desirable to concentrate litigation of the claims herein in this forum.

(d)     The proposed class action is manageable.

## COUNT I

### VIOLATION OF RICO 18 U.S.C. § 1962(d) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(a) AND (c)

#### (All Plaintiffs and Global Class vs. All Defendants)

157.   Plaintiffs and class members incorporate and reallege paragraphs 1-22, 38-107 and 114-156 above as if fully set out herein.

158.   This claim for relief arises under 18 U.S.C. § 1964(c).

159.   In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above, conspired to violate:  18 U.S.C. § 1962 (a) by using and investing income received from a pattern of racketeering, directly or indirectly, to establish and operate the MCE, which is engaged in, and whose activities affect, interstate commerce; and 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the MCE through a pattern of racketeering.

160.   As a direct and proximate result, Plaintiffs and class members have been injured in their business or property by both the predicate acts which make up the Defendants' patterns of racketeering and their investment and reinvestment of income therefrom to operate, expand and perpetuate the MCE.

161.   Specifically, Plaintiffs and class members have been injured in their business or

property by the denial of payments for covered, medically necessary services that they have rendered to Defendants' insureds, by reductions in such payments when made, by late payments, by having their capitation payments reduced by false patient rolls, false prescription drug costs and other manipulations of the capitation process, and by the loss of interest on both late and withheld payments.

COUNT II

VIOLATION OF 18 U.S.C. § 2 BY SEEKING TO AND AIDING AND ABETTING IN THE VIOLATION OF 18 U.S.C. § 1962(a) AND (c)

(All Plaintiffs and Global Class vs. All Defendants)

162.  Plaintiffs incorporate and reallege the allegation paragraphs 1-22, 38-107 and 114-156 above as if fully set out herein.

163.  This claim arises under 18 U.S.C. § 1964(c).

164.  As set forth above, Defendants knowingly, and with shared intent, sought to, and have, aided and abetted each of the other Defendants in the commission of predicate acts, in engaging in a pattern of racketeering activity, and in violating of U.S.C. § 1962(a) and (c) as described in paragraph 132-136 and 159 above.

165.  As a result, under 18 U.S.C. § 2, the RICO violations of each Defendant are those of the others as if they had been committed directly by them.

166.  As a direct and proximate result of the fact that each Defendant aided and abetted the others in violating 18 U.S.C. § 1962 (a) and (c), Plaintiffs and class members have been injured in their business or property by both the predicate acts which make up the Defendants' patterns of racketeering and their investment and reinvestment of income therefrom to operate, expand and perpetuate the MCE.

167.  Specifically, Plaintiffs and class members have been injured in their business or property by the denial of payments for covered, medically necessary services that they have

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

rendered to Defendants' insureds, by reductions in such payments when made, by late payments, by having their capitation payments reduced by false patient rolls, false prescription drug costs and other manipulations of the capitation process, and by the loss of interest on both late and withheld payments.

**COUNT III**

**VIOLATIONS OF RICO 18 U.S.C. § 1962(a) AND (c)**

**(Plaintiffs Backer, Book, Goodman, Hansen, Harrison, Kelly, Moran, Porth, Shane, A. Taleisnik, J. Taleisnik and Wilson and the National Nonarbitration and Noncontract Subclasses vs. All Defendants)**

168.  The above Plaintiffs and the National Nonarbitration and Noncontract subclasses reallege and incorporate paragraphs 1-22, 38-102, 114-136 and 141-156 above as if fully set forth herein.

169.  This claim for relief arises under 18 U.S.C. § 1964 (c).

170.  As set forth above, Defendants have violated 18 U.S.C. § 1962 (a) by using and investing income received from a pattern of racketeering, directly or indirectly, to establish and operate the MCE, which is engaged in, and whose activities affect, interstate commerce, and have violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the MCE through a pattern of racketeering.

171.  As a direct and proximate result, Plaintiffs and the Count III subclass  members have been injured in their business or property by both the predicate acts which make up the Defendants' patterns of racketeering activity and their investment and reinvestment of income therefrom to operate, expand and perpetuate the MCE.

172.  Specifically, Plaintiffs and Subclass members have been injured in their business or property by the denial of payments for covered, medically necessary services that they have rendered to Defendants' insureds, by reductions in such payments when made, by late payments,

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

by having their capitation payments reduced by false patient rolls, false prescription drug costs and other manipulations of the capitation process, and by the loss of interest on both late and withheld payments.

## COUNT IV

### DECLARATORY AND INJUNCTIVE RELIEF
### UNDER 18 U.S.C. § 1964(a)

**(All Plaintiffs, The Global Class, The National Nonarbitration and
Noncontract Subclasses and The Associational Plaintiffs vs. All Defendants)**

173.   The Plaintiffs, the Global Class, the National Nonarbitration and Noncontract Subclasses and the Associational Plaintiffs reallege and incorporate paragraphs 1-156 above as if set forth fully herein.

174.  This claim arises under 18 U.S.C. § 1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. § 1962, and under 28 U.S.C. § 2201 which authorizes associated declaratory relief.

175.   As set forth in Counts I – III above, Defendants have violated 18 U.S.C. §§ 1962(a), (c) and (d), and will continue to do so in the future.

176.   Enjoining the Defendants from committing these RICO violations in the future and/or declaring their invalidity is appropriate as the Plaintiffs, the Class, the Associational Plaintiffs and the Count IV Subclasses have no adequate remedy at law, and will, as set forth in paragraphs 121-125 above, suffer irreparable harm in the absence of the Court's declaratory and injunctive relief.

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

## COUNT V

## BREACH OF CONTRACT

**(Plaintiffs Backer, Book, Goodman, Harrison, Moran, Porth, Shane, A. Taleisnik and J. Taleisnik,  The National Nonarbitration Subclass and, as to Declaratory and Injunctive Relief,  The Associational Plaintiffs vs. All Defendants Except Anthem)**

177.  The above Plaintiffs, the National Nonarbitration Subclass and the Associational Plaintiffs incorporate and reallege paragraphs 1-102, 108-113 and 141-156 above as if fully set forth herein.

178.  The fee for service contracts between Defendants and the Count V Plaintiffs and Subclass members call for the doctors to be paid in a timely manner for the covered, medically necessary services they render to Defendants' insureds in a timely manner.

179.  As described above, Defendants have breached their contractual obligations by using automated processing schemes and other tactics to deny, reduce and delay payment for covered, medically necessary services, thereby damaging the Count V Plaintiffs and Subclass members.

180.  Defendants have also breached their capitation agreements with the Count V Plaintiffs and Subclass members by withholding capitation payments for enrolled insureds until they actually seek medical treatment, charging pharmacy risk pools with inflated rather than actual costs for prescription drugs, falsely manipulating year end statements to avoid paying contract incentives, and using automated processing schemes to understate the covered, medically necessary services doctors perform so as to further reduce capitation payments.

181.  The Count V Plaintiffs and Subclass members are damaged by these breaches when capitation payments called for under their contracts are withheld or reduced.

182.  These breaches are also repetitive and continuing.  As set forth in paragraphs 121-125 above, the Count V Plaintiffs and Subclass members have no adequate remedy at law to stop

43

future breaches and will suffer irreparable harm without appropriate declaratory and injunctive relief.

**COUNT VI**

**CONSTRUCTIVE CONTRACT/UNJUST ENRICHMENT**

**(Plaintiffs Backer, Book, Hansen,  A. Taleisnik, J. Taleisnik and Wilson,
The National Noncontract Subclass, and, as to Declaratory and Injunctive
Relief, The Associational Plaintiffs vs. Defendants Humana, United, Prudential,
WellPoint, HealthNet and PacifiCare)**

183.    The above Plaintiffs, the National Noncontract Subclass members and the Associational Plaintiffs incorporate and reallege paragraphs 1-102, 108-113 and 141-156 above as if set forth fully herein.

184.   By treating Defendants' insureds, the Count VI Plaintiffs and Subclass members confer a benefit upon Defendants.

185.   Defendants are aware of this benefit, solicit it, and accept it.

186.    However, Defendants retain a portion of these benefits by denying, diminishing, and delaying payment for these services.

187.    It would be inequitable to allow Defendants to retain these benefits under the circumstances, and they are unjustly enriched thereby.

188.   Defendants continue to unjustly enrich themselves in this fashion.  As set forth in paragraphs 108-113 above, the Count VI Plaintiffs, Subclass members and Associational Plaintiffs have no adequate remedy at law to stop this future confiscation, and will suffer irreparable harm without appropriate declaratory and injunctive relief.

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

## COUNT VII

### Claim for Violations of State Prompt-Pay Statutes

**(Plaintiffs Backer, Book, Goodman, Hansen, Harrison, Moran, Porth, Shane, A. Taleisnik, J. Taleisnik and Wilson and The Prompt Pay Subclass vs. All Defendants)**

189.   The above Plaintiffs and the Prompt Pay Subclass members incorporate and reallege paragraphs 1-22, 38-70, 80-83 and 141-156 above as if fully set out herein.

190.   Statutes in the following States require prompt payment of properly submitted claims, and provide for interest on late payments:   Alabama (Ala. Code § 27-1-19); Arizona (Ariz. Rev. Stat. Ann. § 20-3102); Arkansas (Ark. Code Ann. § 23-66-201); California (Cal. Health and Safety Code §§ 1371 and 1371.35); Colorado (Colo. Rev. Stat. Ann. § 10-16-106.5); Connecticut (Conn. Gen. Stat. § 38a-816); Florida (Fla. Stat. §§ 627.613, 641.3155); Georgia (O.C.G.A. §§ 33-30-6 and 33-24-59.5); Illinois (215 Ill. Comp. Stat. §5/357.9); Kansas (Kan. Stat. Ann. § 40-2440 et. seq.); Kentucky (Ky. Rev. Stat. Ann. § 304.17A-700 et. seq.); Louisiana (La. Rev. Stat. Ann. § 22:250.32); Maine (Me. Rev. Stat. Ann. Title 24-A, § 2436); Maryland (Md. Code Ann., Ins. § 15-1005); Massachusetts (Mass. Gen. Laws Ann. ch. 176B § 7, 176 G §§ 5,6); Michigan (Mich. Comp. Laws Ann. §§ 500.2006 and 400.111i); Mississippi (Miss. Code Ann. § 83-9-5); Missouri (Mo. Ann. Stat. § 376.383); Nevada (Nev. Rev. Stat. Ann. §§ 683A.0879, 689A.410, 689B.255, 689C.488, 695C.185); New Hampshire (N.H. Rev. Stat. Ann. §§ 415:6h, 415:18k, 420-A:17-d, 420-J:8-a);  New Jersey (N.J. Stat. Ann. § 17B:27-44.2); New Mexico (N.M. Stat. Ann. § 59A-2-9.2); New York (N.Y. Ins. Law § 3224-a); Ohio (Ohio Rev. Code Ann. § 3901.38); Oklahoma (Okla. Stat. Title 36 § 1219); Pennsylvania (40 Pa. Cons. Stat. § 99.2166); Tennessee (Tenn. Code Ann. § 56-7-109); Texas (Tex. Ins. Code Ann. § 20A.18B); Virginia (Va. Code Ann. § 38.2 – 3407.15); Washington (Wash. Admin. Code § 284-43-321); West Virginia (W. Va. Code § 33-11-4); Wisconsin (Wis. Stat. Ann. § 628.46).

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

191.   The Count VII Plaintiffs provide services on a fee for service basis to patients insured by one or more of the Defendants in California, Colorado, Florida, Georgia, Kentucky and Texas, and in doing so have been victimized by payments made beyond the statutory time limit on properly submitted claims pursuant to the scheme described above.

192.   Members of the prompt pay subclass provide services on a fee for service basis to patients insured by one or more of the Defendants in all of the States with prompt pay statutes, and in doing so have been victimized by payments made beyond the statutory time limit on properly submitted claims pursuant to the scheme described in paragraphs 62-70 and 80-83 above.

193.   Pursuant to their scheme to delay payments, the following Defendants have violated the prompt pay statutes in the following states:

a.   Coventry – Florida, Georgia, Illinois, Kansas, Louisiana, Maryland, Missouri, New Jersey, Pennsylvania, Virginia, West Virginia;

b.   Foundation – Arizona, California, Colorado, Connecticut, Florida, Louisiana, New Jersey, New Mexico, New York, Ohio, Oklahoma, Pennsylvania and Washington;

c.   Humana – Arizona, Colorado, Florida, Georgia, Illinois, Kansas, Kentucky, Missouri, Nevada, Ohio, Tennessee, Texas and Virginia;

d.   PacifiCare – Arizona, California, Colorado, Kentucky, Nevada, Ohio, Oklahoma and Texas;

e.   Prudential -- Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Kansas, Kentucky, Maryland, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas and Virginia;

f.   United – Arkansas, Alabama, Arizona, Colorado, Florida, Georgia, Illinois, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Tennessee, Texas, Virginia and Wisconsin;

g.   WellPoint – California, Georgia, Illinois, Kentucky, Nevada, Ohio, Texas and Virginia.

194.   To the extent state prompt pay statutes afford the right to prompt payment directly to health care providers, the Count VII Plaintiffs and Prompt Pay Subclass members bring this

46

claim in their own right.

195.   To the extent state prompt pay statutes afford the right to prompt payment to patients, the Count VII Plaintiffs and Subclass members bring this claim as the assignees of the patients' rights.

196.   When services are rendered to patients who are members of ERISA plans, and the state prompt pay statute affords the right to prompt payment to the patient as opposed to the doctor, the Count VII Plaintiffs and Subclass members bring this claim pursuant to Section 502(a) of ERISA, 29 U.S.C. § 1132(a).

197.   To the extent the Count VII Plaintiffs' and Subclass members' claims are ERISA claims, exhaustion is not required because, as set forth above, Defendants' late payments are part of an intentional scheme that renders resort to administrative remedies futile.  In addition, these remedies are inadequate and impractical, and the Count VII Plaintiffs and class members have no meaningful access to them.  Beyond this, Defendants do not notify the Count VII Plaintiffs and Subclass members that they are denying benefits as required by 29 U.S.C. § 1132(1). Rather, they conceal the denial of benefits.

198.   The prompt pay statutes in Alabama, Mississippi, Nevada, Texas and Virginia expressly provide for a private right of action.  In the remaining prompt pay states, the Count VII Plaintiffs and Subclass members have an implied right of action because they, or their assignors, are members of the class for whose benefit the statute was enacted, because legislative intent that there be a way to effectuate the specific liability imposed by the statutes is manifest, because implication of a private right of action is consistent with the purpose of the statutes, and because none of the statutes preclude a private right of action.

47

## COUNT VIII

## VIOLATION OF CALIFORNIA

## BUSINESS AND PROFESSIONS CODE § 17200

**(Plaintiffs Hansen, Klay, A. Taleisnik, J. Taleisnik and Wilson, The California Subclass And, As to Declaratory and Injunctive Relief, Associational Plaintiff CMA vs. All Defendants Except Coventry, Humana and Anthem)**

199.   The above Plaintiffs the California Subclass and Associational Plaintiff CMA incorporate and reallege the allegations of paragraphs 1-113 and 141-156 above as if fully set out herein.   For purposes of Count VIII only, all references to "Defendants" exclude Coventry, Humana and Anthem.

200.   The Count VIII Plaintiffs and Subclass members have treated Defendants' insureds on a fee for service or capitation basis in California.

201.   California Business and Professions Code § 17203 provides that any court of competent jurisdiction may enjoin any person from engaging in unfair competition and restore to any person who is a victim of that unfair competition any money acquired thereby.

202.   The Count VIII Plaintiffs, Subclass members and Defendants are all persons within the meaning of § 17203.

203.   California Business and Professions Code §17200 defines unfair competition to include "any unlawful, unfair or fraudulent business act or practice."

204.   The conduct of Defendants in connection with the Count VIII Plaintiffs' treatment of their insureds constitutes unfair and fraudulent business acts or practices within the meaning of Section 17200, and is unlawful under the civil common law as well as federal and state statutes, including without limitation California Civil Code §§ 1770 (a)(5)(7)(9) and (14), and California Health and Safety Code §1371.

205.   As a result of their acts of unfair competition Defendants have and continue to

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

receive and retain monies that rightfully belong to the Count VIII Plaintiffs and Subclass members as compensation for rendering covered, medically necessary services to Defendants' insureds. Defendants should be required to restore these monies.

206.    In addition, Defendants' unfair competition is likely to continue absent judicial intervention. This conduct threatens not only the economic well being and future viability of Plaintiffs and the Subclass members' practices, but the health of the public.

207.    As set forth in paragraphs 108-113 above, requiring the disgorgement and restitution of past ill-gotten gain is not an adequate remedy for future losses, and future actions for restitution are neither an effective nor a practical option.

208.    Without an adequate remedy at law, declaratory and/or injunctive relief is appropriate to prevent irreparable harm to the Count VIII Plaintiffs, Subclass members, CMA and the public.

## COUNT IX

### VIOLATION OF NEW JERSEY
### CONSUMER FRAUD ACT

**Plaintiffs Book, Hansen, A. Taleisnik, J. Taleisnik and Wilson,**
**The Prudential Subclass and, As to Declaratory and Injunctive Relief,**
**The Associational Plaintiffs v. Prudential**

209.    The above Plaintiffs, the Prudential Subclass and the Associational Plaintiffs reallege and incorporate the allegations of paragraphs 1-113 and 114-156 above as if set forth fully herein.

210.    The New Jersey Consumer Fraud Act, NJ ST 56:8-1 et. seq., makes it unlawful to use or employ … "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with intent that others rely upon such concealment in connection with the sale … of any merchandise …."

49

211.  The Count IX Plaintiffs and Subclass members are consumers within the meaning of the New Jersey Consumer Fraud Act and are entitled to seek redress thereunder.

212.  Defendant Prudential is a "person" within the meaning of the New Jersey Consumer Fraud Act.

213.  The Count IX Plaintiffs' and Subclass members' provision of medical services to Prudential's insureds, and Prudential's payment therefor, either on a fee for service or capitation basis, constitutes the "sale" of "merchandise" within the meaning of the New Jersey Consumer Fraud Act.

214.  The conduct of Prudential in connection with Plaintiffs' and Subclass members' treatment of its insureds, either on a fee for service or capitation basis, constitutes "the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission in connection with the sale ... of any merchandise."   As such, it violates the New Jersey's Consumer Fraud Act.

215.  Defendant Prudential's conduct in violation of the New Jersey Consumer Fraud Act was conceived, devised, planned, implemented, approved and/or executed within the State of New Jersey, which has an interest in ensuring that its residents do not violate the New Jersey Consumer Fraud Act.

216.  Defendant Prudential intended for the Count IX Plaintiffs and Subclass members to rely on its misrepresentations, omissions, fraudulent conduct and/or deceptive/misleading practices in agreeing to provide and providing medical services to Prudential's insureds, on a fee for service or capitation basis, in billing Prudential for services provided to its insureds, or accepting reduced capitation payments for those services, and in continuing to provide medical

50

goods and services to Prudential's insureds.

217.   The Count IX Plaintiffs and Subclass members have suffered ascertainable actual economic damages as a direct and proximate cause of Defendant Prudential's violations of the New Jersey Consumer Fraud Act.

218.   As a direct and proximate result of its conduct, Defendant Prudential has received and continues to receive payments which rightfully belong to the Count IX Plaintiffs and Subclass members, and has reaped large profits at their and the public's expense.  This conduct will continue and, as set forth in paragraphs 108-113 above, the Count IX Plaintiffs, Subclass members and the Associational Plaintiffs have no adequate remedy at law and will suffer irreparable harm without appropriate declaratory and/or injunctive relief.

219.   Defendant Prudential's violation of the New Jersey Consumer Fraud Act was willful and in reckless disregard for the rights and interests of the Class IX Plaintiffs and Subclass members, entitling them to punitive as well as compensatory damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiffs, the Associational Plaintiffs and members of the Class and Subclasses pray for the following relief:

**AS TO COUNTS I AND II:**   A judgment in favor of all Plaintiffs and Global Class members against all Defendants, jointly and severally, for treble the amount of damages suffered by reason of payments due them for services rendered on a fee for service or capitation basis having been wrongfully withheld, denied or reduced through Defendants' predicate acts and violations of Sections 1962(a) and (c) of RICO, together with treble the amount of interest due on payments delayed or withheld through the Defendants' predicate acts and RICO violations.

**AS TO COUNT III:**   A judgment in favor of the Count III Plaintiffs and members of the

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

National Nonarbitration and Noncontract Subclasses against the respective Defendants for treble the amount of damages suffered by reason of payments due them for services rendered on a fee for service or capitation basis having been wrongfully withheld, denied or reduced through Defendants' predicate acts and violations of Sections 1962(a) and (c) of RICO, together with treble the amount of interest due on payments delayed or withheld through Defendants' predicate acts and RICO violations.

**AS TO COUNTS IV, V, VI, VIII and IX:**  Injunctive relief preventing Defendants from employing automated processing techniques that use improper cost-based criteria to reject claims, that improperly downcode and bundle procedures, that ignore modifiers and that otherwise improperly alter or adjust claims as a means of denying or reducing payments due Plaintiffs and members of the Global Class, National Nonarbitration Subclass, National Noncontract Subclass California Subclass, and Prudential Subclass for rendering covered, medically necessary services to Defendants' insureds; Injunctive relief preventing Defendants from "pending" claims that are ripe for payment and intentionally understaffing their claims processing departments as a means of delaying payments due Plaintiffs and members of the Global Class, Nonarbitration Subclass, National Noncontract Subclass, California Subclass, and Prudential Subclass for rendering covered, medically necessary services to Defendants' insureds; Injunctive relief preventing Defendants from withholding capitation payments for enrolled group members until they need medical treatment, charging pharmacy risk pools inflated rather than actual costs of prescription drugs, manipulating incentive payments to reduce capitation payments, and using the automated processing techniques referenced above to improperly reduce calculated payments for services performed by capitated doctors to further reduce future capitation payments due Plaintiffs and members of the Global

52

Class, National Nonarbitration Subclass, National Noncontract Subclass, California Subclass, and Prudential Subclass; and a judgment declaring the above practices to be violative of federal and state law.

**AS TO COUNTS V and VI:**  A judgment in favor of the Count V and VI Plaintiffs and members of the National Nonarbitration and Noncontract Subclasses against the respective Defendants for damages in the amount, or restitution, of payments due for services rendered on a fee for service or capitation basis that have been wrongfully withheld, denied or reduced through Defendants' automatic claims processing schemes or manipulation of the capitation process, and interest due on delayed and withheld payments.

**AS TO COUNT VII:**  A judgment in favor of the Count VII Plaintiffs and the members of the Prompt Pay Subclass against the respective Defendants for statutory interest due on late payments.

**AS TO COUNT VIII:**  A judgment in favor of the Count VIII Plaintiffs and the California Subclass against Defendants HealthNet, PacifiCare, Prudential, United and WellPoint respectively requiring disgorgement and restitution of the monies due Plaintiffs for treating their insureds on a fee for service or capitated basis that has been wrongfully confiscated through Defendants' unlawful, unfair and fraudulent business practices, together with interest on payments delayed or withheld in such manner.

**AS TO COUNT IX:**  A judgment in favor of the Count IX Plaintiffs and the Prudential Subclass against Prudential in the amount of damages suffered by reason of payments due for rendering covered, medically necessary services on a fee for service or capitated basis having been wrongfully withheld, denied or reduced pursuant to Prudential's fraudulent or deceptive acts or practices, for interest on payments delayed or withheld in

53

such manner, and for punitive damages.

Plaintiffs and the Class and Subclass members further pray for an award of attorneys fees where permitted by law and such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable as a matter of right.

Dated this 1st day of September, 2004.

Kozyak Tropin & Throckmorton, P.A.
200 South Biscayne Boulevard, Suite 2800, Miami, Florida 33131 • Tel. 305-372-1800

Archie C. Lamb, Jr.
LAW OFFICES OF ARCHIE LAMB
2017 Second Avenue North
Birmingham, AL 35203
Tel: 205-324-4644

Aaron Podhurst
PODHURST ORSECK
25 W. Flagler Street, Suite 800
Miami, FL 33130

James B. Tilghman, Jr. (Fla. Bar No. 207209)
STEWART TILGHMAN FOX & BIANCHI
1 SE 3rd Avenue, Suite 3000, Miami, FL 33131

Nicholas B. Roth
EYSTER KEY TUBB WEAVER & ROTH
402 E. Moulton Street, Decatur, AL 35601

Jeffery A. Mobley
LOWE MOBLEY & LOWE
1210 - 21st Street, Haleyville, AL 35565

Robert Foote
FOOTE & MEYERS
416 South Second Street, Geneve, IL 60134

Joe R. Whatley, Jr.
WHATLEY DRAKE
2323 2nd Avenue North, Birmingham, AL 35203

Mark Gray
GRAY & WEISS
1200 PNC Plaza, 500 West Jefferson
Louisville, KY 40202

J. Mark White
WHITE DUNN & BOOKER
2025 3rd Avenue North, Suite 600
Birmingham, AL  35203

2957/101/243494.1

Harley S. Tropin  (Fla. Bar No. 241253)
Janet L. Humphreys  (Fla. Bar No. 607258)
Adam M. Moskowitz  (Fla. Bar No. 984289)
KOZYAK TROPIN & THROCKMORTON
200 S. Biscayne Boulevard, Suite 2800
Miami, FL 33131
Tel: 305-372-1800

Dennis G. Pantazis
WIGGINS CHILDS QUINN & PANTAZIS
301 - 19th Street North, Birmingham, AL 35203

Kenneth S. Canfield
DOFFERMYRE SHIELDS CANFIELD
KNOWLES & DEVINE
1355 Peachtree Street, Suite 1600
Atlanta, GA 30309

Edith M. Kallas
Joseph P. Gugliemo
MILBERG WEISS BERSHAD & SCHULMAN
One Pennsylvania Plaza, 48TH Floor
New York, NY 10119

Guido Saveri/R. Alexander Saveri
Cadio Zirpoli
SAVERI & SAVERI
111 Pine Street, Suite 1700
San Francisco, CA 94111-5619

James E. Hartley, Jr.
DRUBNER HARTLEY & O'CONNOR
500 Chase Parkway, 4th Floor
Waterbury, CT 06708

55

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on this 1st day of September, 2004, a true copy of the

foregoing was served via electronic mail and hard copy to the following counsel:

Humana, Inc. and Humana Health Plan, Inc.
 K. Lee Blalack
O'Melveny & Myers, LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Coventry Health Care, Inc.
Thomas C. Zielinski
2751 Centerville Road, Suite 400
Wilmington, Delaware 19808

Health Net, Inc.
R. Ryan Stoll
Skadden Arps Slate Meagher & Flom, LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606

PacifiCare Health Systems, Inc.
Christopher R.J. Pace
Cooley Godward LLP
4401 Eastgate Mall
San Diego, California 92121

Prudential Insurance Company of America
Mark S. Raffman
SHEA & GARDNER
1800 Massachusetts Ave, NW
Washington, DC 20036

United Health Group and United Health Care
Edward Soto
Weil Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131

WellPoint Health Networks, Inc.
 Stan Blumenfeld
O'Melveny & Myers, LLP
400 South Hope Street
Los Angeles, California 90071

Anthem, Inc.
E. Desmond Hogan
Hogan & Hartson, LLP
555 - 13th Street, NW
Washington, DC 20004

2957/101/243494.1

56